## Commonwealth *v.* Chaitt, Appellant.

Argued November 17, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER, WRIGHT and WOODSIDE, JJ.

*Lemuel B. Schofield,* with him *John B. Brumbelow, John S. Reynolds* and *W. Hensel Brown,* for appellant.

*William C. Storb,* District Attorney, for appellee.

OPINION BY WOODSIDE, J., July 13, 1954:

The only question involved in this appeal is whether the testimony of local police officers relating conversations of the accused heard through tapping a telephone wire is admissible against one charged with crime in a court of this Commonwealth. We think it is.

The appellant was tried before a jury in the Quarter Sessions Court of Lancaster County on the charges of bookmaking and being a common gambler.

At the trial the Commonwealth produced the testimony of two police officers of the City of Lancaster. It appeared from their testimony that Richard Manduchi had an apartment at 715 N. Duke Street, Lancaster. The owner of the apartment house, at the request of the police officers, took them into the basement by a rear entrance and showed them the inside telephone terminal box. From it the officers followed the wires to where they led up through the floor to Manduchi's apartment. The officers then tapped these wires and during the afternoons of the next several days listened to the telephone conversations.

While the officers were listening Manduchi received a number of telephone calls from different persons placing horse racing bets with him. Manduchi would then telephone the appellant, Isaac Chaitt, and sometimes make the same bet with the appellant which had been made with him, and at other times he would make what is referred to as "lay off" bets.[1] There was some

---

[1] As insurance companies often reinsure in other companies risks which they consider too large to carry themselves, so, we are told, bookmakers and professional number bankers who get too many bets on one horse or number, or get too large a bet, frequently "sell" part of it to another operator. Generally, although not always, the smaller operator finds it necessary to secure a larger or wealthier operator to accept "lay off" bets from him.

evidence that Manduchi and the appellant were partners.

Timely objections were made to the admission of this evidence on the grounds that it violated the 4th, 5th, and 14th Amendments to the Constitution of the United States, Article 1, Section 8 of the Pennsylvania Constitution[2] and the Federal Communications Act of June 19, 1934; 48 Stat. 1064, 47 U.S.C.A. 151, et. seq. The objections were overruled, an exception noted and the evidence admitted. The jury found appellant guilty. On motion for a new trial the court en banc upheld the admission of the testimony obtained by wire tapping. The defendant was then sentenced to fine and imprisonment on the charge of bookmaking. From this judgment he appealed.

It is conceded by the District Attorney that the evidence of telephone conversations obtained by wire tapping was a material part of the Commonwealth's case and must have had a substantial effect on the verdict of the jury. Thus, if the testimony was improperly admitted, a new trial should be granted.

The question of admitting evidence obtained by wire tapping has been a highly controversial one on which students of law and government have held divergent views and strong convictions. The subject encourages courts to divide, Congress and Legislatures to debate, law reviews to philosophize and newspapers to editorialize—frequently and often vituperatively.[3] In spite of this, the law which the Court should apply to this case is clear.

---

[2] Art. 1, Sec. 8 of the Pennsylvania Constitution and the 4th Amendment to the Federal Constitution deal with illegal search and seizure; the 5th Amendment deals with being compelled to give evidence against one's self and the 14th with due process.

[3] For recent law review articles on the subject see The Yale Law Journal, April 1954, Vol. 63, No. 6, Pages 792 and 799.

So much has been written by the courts that dicta can be found to support almost any conceivable position which a lawyer might deem advantageous to assume. The law, however, can be best understood by examining what the courts have *held* on the subject of admitting testimony improperly obtained, and on the subject of wire tapping.

The 5th and 14th Amendments to the Constitution of the United States have no application to the facts of this case. An incriminatory telephone conversation voluntarily conducted by the accused and secretly overheard from a tapped wire does not compel the accused to be a witness against himself in violation of the 5th Amendment. *Olmstead et al. v. United States,* 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928). Neither does the 14th Amendment prevent the admission of such testimony by state officials in a state court. *Irvine v. California,* 347 U. S. 128, 74 S. Ct. 381, 383, 98 L. Ed. 324 (1954).

Turning to the question of admitting evidence obtained by illegal means, we find that the common law rule, supported by many English and American cases, is that the admissibility of evidence is not affected by the illegality of the means by which it was obtained. *Adams v. New York,* 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575 (1904) ; *Olmstead et al. v. United States,* supra, p. 467; *Com. v. Agoston,* 364 Pa. 464, 72 A. 2d 575 (1950).

Although the Supreme Court showed an inclination to deviate from this rule in *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886) it is generally accepted that until 1914 this was the rule in every English speaking jurisdiction in the world with the exception of Iowa.[4]   See Appendix in *Wolf v.*

---

[4] See *State v. Height,* 117 Iowa 650, 91 N. W. 935 (1902). After pioneering in the doctrine adopted by the United States Su-

*Colorado,* 338 U. S. 25, 33, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949).

That year the Supreme Court of the United States in *Weeks v. United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), decided that letters taken from the house of the accused by an official of the United States acting under color of his office in direct violation of the constitutional rights of the defendant were improperly admitted into evidence in a Federal Court. This exception to the common law rule was limited to evidence obtained by federal officials, for in the same case it was held that papers and property illegally seized by policemen not acting under any claim of Federal authority were properly admitted into evidence.[5]

By 1949 only sixteen of the state courts had followed the Federal rule. Thirty-one states, including Pennsylvania, and all other English speaking jurisdictions, adhered strictly to the common law rule. See Appendix to *Wolf v. Colorado,* supra.

In *Com. v. Dabbierio,* 290 Pa. 174, 138 A. 679 (1927), our Supreme Court held that Article 1 Section 9 of the Pennsylvania Constitution does not forbid the receipt of evidence, on the trial of their former possessor, of articles taken under a search warrant which was wrongfully issued and served. Although admitting "the great

---

preme Court in the *Weeks* case the Iowa courts subsequently rejected this doctrine and returned to the common law rule, pointing out that "the due administration of the criminal law would be seriously hampered and in many cases entirely subverted by a strict adherence" to the rule in the *Height* case. See *State v. Tonn,* 195 Iowa 94, 191 N. W. 530, 535 (1923) ; *State v. Rowley,* 197 Iowa 977, 195 N. W. 881 (1923).

[5] Following this rule, private papers stolen from the accused by private citizens and delivered to a law officer of the United States were held admissible against him in federal court. *Burdeau v. McDowell,* 256 United States 465, 476, 41 S. Ct. 574, 65 L. Ed. 1048 (1921).

persuasive effect to be given to the decisions of that eminent tribunal, even when they are not binding" upon it, our Supreme Court nevertheless rejected the reasoning of the *Weeks* case and like the vast majority of other jurisdiction adhered to the common law rule. Page 179.

In *Com. v. Agoston*, supra, page 484, our Supreme Court again followed what had "long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence."

As late as 1953 our own Court in *Com. v. Montanero*, 173 Pa. Superior Ct. 133, 96 A. 2d 178 (1953) held that the admissibility of evidence is not affected by the illegal methods by which it was procured.

In that case Judge Reno again considered the Federal rule and said:

"Appellee relies upon cases decided by the United States Supreme Court, such as Boyd v. U. S., 116 U. S. 616, 6 S. Ct. 524; Adams v. New York, 192 U. S. 585, 24 S. Ct. 372, and Weeks v. U. S., 232 U. S. 383, 34 S. Ct. 341. These cases and their cogeners lay down rules of evidence which apply only in the Federal courts. They are not binding upon the courts of this State and have been expressly repudiated by them. Com. v. Dabbierio, supra; Com. v. Schwartz, supra. Moreover, the United States Supreme Court has held that its rule which excludes illegally obtained evidence is not applicable to trials in state courts; Wolf v. Colorado, 338 U. S. 25, 69 S. Ct. 1359, and has recognized our Dabbierio case as an authoritative pronouncement of Pennsylvania's posture." Page 136.

Now let us turn to the question of whether secretly tapping a telephone wire is a violation of a person's rights as guaranteed by the 4th Amendment. It is not.

The Supreme Court of the United States held that wire tapping did not amount to a search or seizure within the meaning of the 4th Amendment, pointing out that "The Amendment itself shows that the search is to be of material things—the person, the house, his papers or his effects." The language of the Amendment, the Court held, cannot be extended and expanded to include telephone wires reaching to the whole world from defendant's house or office. *Olmstead v. United States,* supra. In that case as here "There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendant." Page 464.

In the *Olmstead* case the court had suggested that Congress could protect the secrecy of telephone messages by making them, when intercepted, inadmissible in evidence in federal criminal trials by direct legislation, and thus depart from the common law rule of evidence. Page 465. Immediately thereafter Congressional Committees investigated this matter, but session after session Congress rejected all efforts to change the law.

When the Federal Communications Act of 1934 supra, passed Congress there was contained in it a provision (Section 605) which the Supreme Court later said did change the federal rule of evidence on admitting conversations obtained by wire tapping.

This Act was passed for the purpose of transferring jurisdiction over radio and wire communications to the newly constituted Federal Communications Commission. The language of Section 605, which we shall discuss later, was borrowed from the Radio Act of 1927. This practically identical provision was in the Radio Act even before the *Olmstead* case was decided. See Dissent of Justice BRANDEIS, footnote 13 page 481.

During the passage of the Communications Act no mention was made of any change in the law relating to wire tapping or the admission of evidence obtained thereby. In fact, Congressman Sam Rayburn in reporting for the Committee on Interstate and Foreign Commerce which had the bill, said to the Members of the House of Representatives on June 2, 1934: "I think it is also a fair statement to make that the bill as a whole does not change existing law, not only with reference to radio but with reference to telegraph, telephone, and cable, except in the transfer of the jurisdiction and such minor amendments as to make that transfer effective." 73rd Congress, Second Session, Congressional Record Vol. 78 part 10, page 10313. Thus Congress was told that the bill did not change existing law with reference to telephone except in the transfer of jurisdiction.

During the entire 1934 Session Congress did not discuss wire tapping. See *Nardone v. United States*, 302 U. S. 379, 382, 58 S. Ct. 275, 82 L. Ed. 314 (1937).

In light of the refusal of Congress to enact legislation prohibiting wire tapping every time the issue was directly presented to it, and its failure to discuss the effect of the passage of the Federal Communications Act on wire tapping, the section was, indeed, what is frequently referred to in legislative parlance as a "sneak amendment."[6]

---

[6] It is not infrequent that important and controversial changes in statutory law, rejected whenever directly presented, are subsequently "found" in codifications or verbose acts whose main purpose is entirely foreign to the unobserved change which is subsequently discovered. As everyone familiar with legislative procedure knows, this sometimes happens by accident and sometimes by design. How often by one cause and how often by the other is anybody's guess.

Just as all efforts to secure the passage of legislation to prohibit wire tapping by Federal officials failed whenever directly

This, of course, does not affect its validity in the courts which are bound by the Act, but it substantially weakens its persuasiveness upon a court not bound by it.

The section referred to above, found in 48 Stat. 1103, 47 U. S. C. A. 605, provides, inter alia, that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person;".

Section 501 penalizes willful and knowing violation by fine and imprisonment. 48 Stat. 1100, 47 U. S. C. A. 501.

The United States Supreme Court held in *Nardone v. United States,* supra, that in view of this section, evidence obtained by Federal agents by tapping telephone wires and intercepting interstate messages is not admissible in a criminal case in the Federal district court. The court refused to apply the rule that general language is not applicable to the sovereign.[7]

Subsequently in *Weiss v. United States,* 308 U. S. 321, 60 S. Ct. 269, 84 L. Ed. 298 (1939) the court held that Section 605 prohibited the interception and divulgence of intrastate as well as interstate conversations.

---

submitted to Congress, so, since the *Nardone* case, have all efforts in Congress to legalize wire tapping also failed. The more controversial a subject is, the more likely it is that a legislative body will refuse to disturb the status quo.

[7] The court's decision in the *Nardone* case refusing to "sanction such conduct on the part of the Executive" (as Justice BRANDEIS put it in the *Olmstead* case) came at a time when the usual mutual confidence and understanding between the judicial and executive branches of the Federal government were at the lowest ebb of anytime during this century, as reference to the debates over the so-called "court packing bill" then pending before Congress clearly demonstrates.

Having thus held that communications intercepted by wire tapping were not admissible in a Federal court the question was presented to the United States Supreme Court in *Schwartz v. Texas,* 344 U. S. 199, 73 S. Ct. 232, 97 L. Ed. 231 (1952), whether these communications were also barred by Section 605 from use as evidence in a criminal proceeding in a state court.

The Court concluded that Congress did not intend the Section to apply to proceedings in state courts and decided that the Federal Act does not exclude such evidence in state court proceedings. The Supreme Court recognized that "This question has been many times before the state courts, and they have uniformly held that Section 605 does not apply to exclude such communications from evidence in state courts." Page 202.

Of course it has long been held that "it is within the established power of the State to prescribe the evidence which is to be received in the courts of its own government. Fong Yue Ting v. United States, 149 U. S. 698, 729." *Adams v. New York,* supra, Page 599.

Reviewing the rules established by the above cited cases we find that (1) wire tapping is not an unlawful search and seizure as contemplated in the 4th Amendment; (2) even if it were a violation of the 4th Amendment, nevertheless evidence obtained by unlawful search and seizure is admissible in the courts of Pennsylvania; (3) wire tapping and divulging what was thereby overheard violates §605 of the Federal Communications Act; (4) this provision makes inadmissible in a Federal court evidence obtained by Federal officials tapping telephone wires; (5) this provision does not deny to the state courts the right to admit evidence obtained by tapping telephone wires.

The appellant does not direct his argument against these rules, and what has been reviewed above is neces-

sary only as background to the full consideration of the issue before us. Appellant concedes that the above Act of Congress does not promulgate a rule of evidence binding upon state courts, and that we are free to formulate our own rule of evidence on the issue.

The contention of the appellant, as ably presented by his counsel, is that not only is the tapping of the wire unlawful, but the testifying in court of what was heard is a violation of the Federal Act, because the witness is thereby "divulging" the communication which he intercepted.[8]

Therefore, it is contended we should promulgate a rule of evidence applicable to the courts of this State that any evidence obtained by tapping a telephone wire should not be admissible.

It is argued that the common law rule, so uniformly applied in this State, holding that the admissibility of evidence is not affected by the illegality of the means by which it was obtained, has no relevancy, because here it is the divulging of the information in court and not the prior unlawful obtaining of it which is involved. It is suggested that in the illegal search and seizure cases the witness is merely telling of a crime previously committed, but in this case the witness is committing a crime by the telling.

It is argued that "a police officer violates the Federal Communications Act when he testifies with respect to a telephone conversation intercepted by means of a wire tap, and the court by permitting such testimony, thereby encourages, condones, and sanctions the violation of a federal statute committed in its very presence." It is even argued that "the court participates in the violation and takes part in the commission of an act which is made a crime by federal statute."

---

[8] The Act says "no person shall intercept any communication *and* divulge the contents," etc. (Emphasis supplied).

This assumes that it is a crime for a witness to testify in a state court concerning a conversation he overheard through a tapped telephone wire. No court ever held this to be a crime. We are not inclined to act upon the assumption that it is.

True in *Nardone v. United States,* supra, the court held that the Federal Statute included within its sweep Federal officers testifying in a Federal court, but no case has been called to our attention where a court, Federal or state, high or low, took the additional step and held that it prohibited state officials from testifying in a state court.

True also there is language in *Schwartz v. Texas,* supra, from which it could be argued that a witness might be prosecuted for so testifying, but that case *held* that the Act of Congress does not exclude evidence obtained by wire tapping sought to be divulged in a state court. *It decided that Congress did not intend to prohibit the admission of this testimony by a state official in a state court. How then can counsel argue or court conclude that Congress intended to make a crime of what it did not intend to prohibit?*

There is a rule of law, too frequently stated to need citation, that general words of a statute do not include the sovereign or affect its rights unless the construction be clear and indisputable. The Supreme Court's refusal to apply this rule to Federal agents testifying in a Federal court does not mean it is not applicable to state officials testifying in a state court. Federal officials, in a sense creations of Congress, are naturally subject to its expressed policy to a much greater extent than state officials.

In the *Schwartz* case the Supreme Court held that section 605, supra, is not applicable to state officials testifying in a state court. It follows, therefore, that

the term "no person" in the provision "no person shall . . . divulge" does not include state officials.

State officials are subject to Federal prosecution for *obtaining* evidence in violation of Federal law even though the evidence is admissible in court. Of course, telling in court of a crime previously committed does not exempt the witness from prosecution. But it does not follow that because a person can be prosecuted for illegally obtaining evidence, he can also be prosecuted for divulging a telephone conversation while testifying in court. There is a distinction between these two situations, which the appellant argues is important enough that what the law is as to one situation should not be the law as to the other.

As the expression "no person shall divulge" does not apply to a state official while a witness in a state court, we think such official cannot be prosecuted for divulging such conversation in court. Unless we assume it is a crime for him to so testify, the argument of the appellant falls.

But there are many other reasons why we should reject the appellant's contention. Let us see what an anomaly we would create in the law by adopting the suggested rule of evidence.

*We would be holding that the law protects by a rule of evidence a right created by an act of Congress while it does not protect by a rule of evidence a right created by both the Constitution of the United States and the Constitution of Pennsylvania.*

By long established and almost universally applied law we admit into evidence papers obtained by violation of the accused's constitutional rights, yet because of a right of the accused inferred from an Act of Congress, held not applicable to State Court procedures, we are asked to refuse to permit a witness to divulge information obtained by wire tapping.

Let us examine the probable consequences of such holding by us. At least one branch of Congress has found the present law relating to wire tapping unsatisfactory, for at this writing the House has sent to the Senate a bill to permit Federal agents to tap telephone wires within certain limitations, and to use the evidence thus obtained.

If we promulgate the rule of evidence urged upon us by appellant, what will happen to it if Congress changes the law? Are our courts to continue to follow a Federal rule so strict that the Federal Government itself found it unsatisfactory? Or would our courts then be asked to bend our rule to comply with all the practices and procedures set forth in the amended Federal act to determine when, where, how and by whom it would be legal to tap wires? Are the state courts to sway like a reed to the winds of Congressional whims?

Of course, our courts could hardly bend the rule to meet all the requirements of a Congressional Amendment without legislating, and thus infringing upon the exclusive powers of our General Assembly. States cannot "adopt" Congressional Acts, held by the Supreme Court of the United States not applicable to us, without wiping out all semblance of independent sovereignty.

Suppose we would say wire tapping evidence may not be admitted because of a Federal Act, and thereafter the Pennsylvania General Assembly says, as New York State did, it can be admitted, either without limitation or with limitations different than Congress might by then have prescribed. Thus after having formulated a court rule on the basis of an Act of Congress we might find the rule quite irreconcilable with future action of both Congress and our own Legislature, not to mention the fact that Acts of Congress and our General Assembly might well also be irreconcilable.

The ultimate result of adopting the rule advocated by appellant would be to create confusion confounded. It would develop into a District Attorney's nightmare and a defense lawyer's paradise.

The criminal jurisprudence of one sovereign should not be under control of another soverign, and to permit Congress to prescribe the rules of evidence for our courts would do just that. See opinion by Chief Justice TANEY in *United States v. Reid*, 53 U. S. 361, 363, 13 L. Ed. 1023 (1851); *Olmstead v. United States*, supra, Page 469.

Turning to precedent we find it, too is against appellant's contention. The precise question here presented was decided, if not precisely argued in the highest courts of New York, Maryland, California and Texas. See *People v. Stemmer*, 298 N. Y. 728, 83 N. E. 2d 141 (1948); *Leon v. State*, 180 Md. 279, 23 A. 2d 706 (1942); *People v. Channell*, 107 Cal. App. 2d 192, 236 P. 2d 654 (1951).

The appellant claims these courts all missed the point, because they did not deal with the "crime in court" theory which he advanced, and with which we have dealt above. Nevertheless, they passed upon the precise question here raised, and uniformly decided that evidence obtained by wire tapping was admissible in a state court in spite of Section 605 of the Communications Act, supra.

Our attention has been called to no case which has held otherwise.

This is the first time this question has been brought before an Appellate Court in Pennsylvania, and for this reason we are dealing rather fully with what might otherwise have been disposed of much more briefly.

The question was before the Allegheny County Court. It decided evidence obtained by wire tapping was admissible against the accused in a court of this Com-

monwealth. See *Com. v. Charpentier,* 99 P. L. J. 219, 78 D. & C. 389 (1951).

Pennsylvania has never made it a crime for a public officer to tap a telephone wire to obtain evidence. Were we to adopt a rule providing that evidence so obtained would not be admissible against an accused, we would seriously handicap law enforcement in this Commonwealth.

How many secrets vital to our national defense may have passed into unfriendly hands because of the federal limitation on wire tapping no man will ever know. But of this we can be certain, the task of the law enforcement officer has been made more difficult thereby.

To suggest that tapping telephone wires by police officers is "dirty business' is beside the point. Shooting a man is "dirty business" too, but we approve of our police officers carrying loaded revolvers. Police officers cannot apprehend the enemies of society while carrying "The Age of Chivalry" in one hand and Emily Post's latest edition on "Etiquette" in the other.

Neither are we impressed by the suggestion that evidence obtained by wire tapping should be admitted only when the accused faces one of the more serious crimes. It is well known that gambling, although a lesser crime, is the lifeblood of the organized underworld. Gangsters and racketeers, with all the varied evils which they inflict upon a community, would be far less powerful and influential without the income realized from organized gambling.

It is interesting to note, although not important to the determination of this case, that the telephone was the very implement through which the offense was committed by the appellant in this case.

It is not the most pleasant thing to realize that some unknown person may be listening to your telephone

conversations,[9] but neither is it pleasant to contemplate that the enemies of society may be planning over the telephone to kidnap your child, or burglarize your home, or rob your bank, or that they are carrying on over the telephone a racket that tends to corrupt your officials, bribe your athletes and cheat your government while we say to our officers—"Don't listen in—it isn't nice."

If this policy of this Commonwealth is to be changed so that this risk is to be imposed upon our people, it is not for the courts to do it by a rule of evidence.

Judgment affirmed.

---

DISSENTING OPINION BY GUNTHER, J.:

The appellant in this case was convicted on two indictments, one of which charged the offense of bookmaking and the other the charge of being a common gambler. The only question involved in this appeal is whether or not testimony concerning a telephone conversation between the appellant and another person, which was intercepted by means of wire tapping by the police officers of the City of Lancaster, should

---

[9] Many telephone subscribers in the rural sections of this Commonwealth and elsewhere have never known the privacy on a telephone that some people consider to be a fundamental right. Those on a multi-party rural line know that their neighbors, at times by accident and maybe at times by design, overhear their conversations and instantly recognize their voices. "Central", as the small town "operator" is called, almost of necessity "knows everything about everybody" in the community. This not only restricts freedom of indiscretion, but is inconvenient, annoying and, at times, exasperating even to the pure in heart. But that this situation has its advantages as well as its disadvantages is known to those who have lived with it. Those who have never had any such experience can read about it in such articles as "Good-Bye, Central" in October 1952 Reader's Digest and "The Dine v. Mildred" in The New York Times Magazine Section of July 4, 1954.

have been admitted in evidence. The trial court allowed evidence thus obtained to be admitted over appellant's objection. The Commonwealth concedes that this evidence formed a material part of its case and that if this admission was improper, a new trial should be granted.

The common law rule was that the admissibility of evidence did not depend upon its being legally obtained, and following this rule, the Pennsylvania courts have repeatedly sustained convictions based upon evidence procured by police officers whose conduct was violative of the search and seizure provision of the Fourth Amendment. *Commonwealth v. Montanero,* 173 Pa. Superior Ct. 133, 96 A. 2d 178. The majority of state jurisdictions have likewise held that evidence thus illegally obtained was nevertheless admissible, the United States Supreme Court in the case of *Wolf v. Colorado,* U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782, pointing out that 30 of the 47 state courts which have passed on this question have allowed the admission of such evidence and that 17 have rejected it. The U. S. Supreme Court in the case of *Weeks v. United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, established the principle, since then law in all of the United States courts, that evidence obtained by means which would constitute an unlawful search and seizure under the Fourth Amendment is inadmissible in a Federal Court. But, as has been stated, this decision has not been followed in the majority of state courts, trying state offenses.

Evidence obtained by wire tapping has been held by the Supreme Court not to be violative of the Fourth Amendment, the Court stating that this Amendment protected against only an unlawful physical entry against the abstraction of tangible property. *Olmstead v. United States,* 277 U. S. 438, 48 S. Ct. 564, 72

L. Ed. 944. However, this decision proved generally unpopular with the result that in several subsequent sessions of Congress, bills were introduced designed to prohibit the practice of wire tapping. Finally in the Federal Communications Act of June 19, 1934, 48 Stat. 1103, 47 U.S.C.A. 605, there was contained a provision (Section 605) which prohibited the interception of any communication by wire and likewise prohibited the divulging or publishing of the contents of such communication. In the leading case of *Nardone v. U. S.*, 302 U. S. 379, 58 S. Ct. 275, 82 L. Ed. 314, it was held that Federal officers were included in this prohibition and that the words "divulge and publish" applied to testimony given before a court. The Court in the last cited case reversed a conviction based on evidence obtained by wire tapping. Furthermore, in the case of *Weiss v. U. S.*, 308 U. S. 321, 60 S. Ct. 269, 84 L. E. 298, it was held that the cited section of the Act applies to intrastate as well as to interstate communications. These decisions have established the law upon this question for all trials in Federal District courts.

The Supreme Court, however, has been very careful to point out that it does not intend to establish a rule of evidence which shall be binding upon State Courts conducting trials involving state offenses. Thus it was stated in the case of *Schwartz v. State of Texas*, 344 U. S. 199, 73 S. Ct. 232, 97 L. Ed. 231: "Indeed, evidence obtained by a state officer by means which would constitute an unlawful search and seizure under the Fourth Amendment to the Federal Constitution is nonetheless admissible in a state court, Wolf v. Colorado, 338 U. S. 25, while such evidence, if obtained by a federal officer, would be clearly inadmissible in a federal court. Weeks v. United States, 232 U. S. 383. The problem under §605 is somewhat different because the

introduction of the intercepted communications would itself be a violation of the statute, but in the absence of an expression by Congress, this is simply an additional factor for a state to consider in formulating a rule of evidence for use in its own courts."

Despite the prohibition contained in the Federal Communications Act and the *Nardone* decision, the courts of several jurisdictions accordingly have admitted evidence so obtained. The State of New York for instance has by Statute provided for the admissibility of evidence obtained by wire tapping, providing, however, certain safeguards against its abuse. The New York Statute requires that an application be made to the Court by the Attorney General, the District Attorney, or a high ranking police officer for permission to intercept telephone messages. Cause must be shown and the particular conversations sought to be intercepted must be detailed. Pennsylvania in common with many other states has no such regulatory Statute, and should it now be held that wire tapping evidence is admissible, it must be admitted indiscriminately and without reserve.

Indeed, this question has never been passed upon by the Appellate Courts of this State, the sole Pennsylvania decision being that of *Commonwealth v. Charpentier*, in the Court of Oyer and Terminer of Allegheny County, in which Judge Soffel in an opinion reported at 99 P.L.J. 219 (78 D & C 389) held such evidence to be admissible. In this opinion, the learned Judge pointed out that the United States Supreme Court has scrupulously refrained from establishing a rule of evidence which would be binding upon State Courts, and hence she found no valid reason to exclude the testimony.

Notwithstanding this decision, the Appellate Courts of this State, if they deem it in the interest of justice

and good morals, may very well follow the suggestion contained in the case of *Schwartz v. Texas,* supra, and exclude such evidence in obedience to the strong public policy enunciated in Section 605 of the Act and in the decisions of the United States Courts. There being no prior Pennsylvania appellate decisions upon this point, our courts are not bound by the rule of stare decisis, as they are as regards the admissibility of evidence obtained by an illegal search or seizure.

There is a clear distinction between the two types of cases and the prior decisions of the courts of this state in the latter field should not be considered as precedents in disposing of the present case. An illegal search or seizure is open and notorious and can readily be redressed, whereas the interference with a person's privacy of conversation is necessarily secret and unknown to the person affected. His conversation can be monitored for months without his knowledge. He is therefore not in a position to invoke official machinery to protect himself. As pointed out in a recent article in 52 Columbia Law Review, page 165, there has been a great increase in the use of wire tapping apparatus, not alone by public officers in serious cases, but by private persons conducting private investigations such as are involved in labor disputes and domestic relations cases. Wire tapping is done not only by the police, but by government agencies, legislative committees, political organizations, law firms, and private detective offices. In a great majority of cases, unless the desired information is obtained, the victims have been completely unaware that every detail of their private lives has been bared to some person or group with a hostile interest.

Perhaps one of the most precious incidents of our liberty is the reasonable right of privacy and nothing can be more intolerable than to realize that our most

intimate conversations are being exposed to the scrutiny of outside persons, either public or private.

It is not determinative that the motives of those who indulge in this practice are sincere. Mr. Justice BRANDEIS stated in his dissent in the *Olmstead* case, supra, "As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared to wire tapping." (page 476) "It is better that a few criminals escape than that the privacies of life of all the people be exposed to the agents of the government, who will act at their own discretion, the honest and the dishonest, unauthorized and unrestrained by the courts." (page 479). "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well meaning but without understanding." (page 479). Mr. Justice HOLMES in the same case referred to wire tapping as a "dirty business."

It is my opinion that while this question is still open for decision, our courts should take a sound American position and refuse to admit evidence obtained from such a dubious source. Perhaps a regulatory Statute such as exists in New York might keep this practice within bounds. But in the absence of regulation of any sort, the knowledge that testimony obtained in violation of the Federal Statute will nevertheless be honored by Pennsylvania courts must encourage a widespread and irresponsible resort to this questionable technique and a consequent disrespect for law.

It is idle to say that the victim has his remedy either by civil action or by instituting a prosecution under the Federal Statute. As has been pointed out, one who has been subjected to wire tapping can rarely know the extent or duration of such subjection. Again, damages to an intangible right are difficult to prove, and more difficult to recover. Insofar as the criminal

remedy is concerned, this practice has been so widespread, even in the offices of the government, that a conviction would be practically impossible to obtain.

The world has been shocked by the judicial methods employed in the last few years in the totalitarian governments of Europe, both in the obtaining of evidence and in the actual trial of cases. It is generally reported that in Nazi Germany prior to its defeat, and in Soviet Russia at the present time, there has been a complete lack of personal privacy and of the normal confidence and intimacy of personal relationships, and that instead a universal suspicion everywhere prevails. It is probably far fetched to compare such conditions with the frankness and freedom of expression which is characteristic of this country, but nevertheless it is important that we should exhibit to the world a complete contrast to totalitarian methods, and that as we reject their concept of government, we likewise reject any practice of espionage which is a natural characteristic of their type of thought.

The offenses with which this defendant was charged are not heinous crimes. They are instead in the nature of malum prohibitum. Perhaps extraordinary methods may be necessary in the detection and punishment of crimes of great social significance even though not justifiable in cases such as the present. Judge LEARNED HAND in the case of *United States v. Coplon,* 185 F. 2d 629, suggests that a distinction should be made as to permitting wire tapping evidence in the trial of minor misdemeanors and in the trial of serious felonies. He states in his opinion at page 640 ". . . and perhaps it would be desirable to set limits—as, for example, . . . cases of espionage, sabotage, kidnapping extortion and in general investigations involving national security and defense—to the immunity from

342

'wiretapping' of those who are shown by independent evidence to be probably engaged in crime."

Considering the widespread abuse which has already arisen from unrestricted wire tapping, and considering the lack of statutory safeguards in this Commonwealth and the nature of the present offense, it is my opinion that this conviction should be reversed.