UNITED STATES of America

v.

Theodore GELLER, Avrim Weiner, Louis DeMaise, Louis Brody, Anthony DeAngelis, Linda Peck, Josephine DeMaise, John Newell, William David Friedman, a/k/a "Bull Dog", a/k/a "Dog", Andrew Samuels, Peter Lassos, a/k/a "Peter Marks", Robert Griggs, George Goldstein, Sava Greenberg.

Crim. No. 82–224.

United States District Court, E.D. Pennsylvania.

April 6, 1983.

**1312**

William B. Carr, Jr., Elizabeth Ainslie, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

R.B. Mozenter, Philadelphia, Pa., for Geller.

R.S. Robbins, Philadelphia, Pa., for Weiner.

Jeffrey Miller, Philadelphia, Pa., for L. DeMaise.

D.M. Moser, Philadelphia, Pa., for DeAngelis.

E.H. Weis, Philadelphia, Pa., for Peck.

D.B. Huyett, Reading, Pa., for J. DeMaise.

Theodore Simon, Philadelphia, Pa., for Newell.

R.D. Atkins, Philadelphia, Pa., for Samuels.

S. LaCheen, Philadelphia, Pa., for Goldstein.

## MEMORANDUM

TROUTMAN, District Judge.

Defendants [1], moving to suppress intercepted wire communications, argue that Pennsylvania's "Wiretapping and Electronic Surveillance Control Act" of 1978, 18 Pa. Con.Stat.Ann. § 5701 *et seq.*, ("Wiretap Act" or "Act"), violates both the federal and state constitutions, that governmental misconduct in acquiring the order authorizing wire interception irredeemably tainted and distorted any permissible interception and that the government agents who executed the order violated legislative and judicial commands. A brief factual background is helpful in understanding our resolution of these issues.

Commencing in November, 1980, state narcotics investigators began an extensive inquiry into the alleged heroin sales and distribution practices of defendants, Theodore Geller and Anthony DeAngelis. As a result thereof, Lawrence Kutney, an agent of Pennsylvania Bureau of Narcotics Investigations and Drug Control (BNIDC) purportedly purchased heroin directly from Geller who, in turn, made statements which indicated that one of his, Geller's, sources of supply was DeAngelis. Once Kutney was satisfied that DeAngelis, who resides at R.D. 1, Pine Road, Boyertown, Pennsylvania, was in fact Geller's supply, he applied to a member of Pennsylvania's Superior Court, Judge Cavanaugh, for an order authorizing the interception of DeAngelis' wire communications. The order was granted and BNIDC placed and maintained a "tap" on DeAngelis' phone. For reasons which are not clear, the federal government, rather than the state, has elected to prosecute the defendants.

■ Because the pre-indictment investigation and wiretaps were conducted by state officers acting pursuant to state law, our inquiry turns to the effect of the state statute and its application in this federal proceeding. In order to support the introduction of intercepted wire communication at trial, state wiretap guidelines must be as stringent as the requirements of federal law. In other words, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20, and the Fourth Amendment to the United States Constitution establish the outer limits of any intrusion into the protected privacy area. State standards which are more protective of this same area must, however, be given effect. Consequently, state law standards which relate to the issuance and execution of a wiretap order predominate where they are more demanding than federal ones. In determining the contours of state law, federal courts may properly consider relevant federal law where state law is inadequate to provide sufficient guidance. Finally, federal evidentiary law governs the introduction of evidence at trial. *See generally, United States v. Lilla,* 534 F.Supp. 1247, 1253–54 (N.D.N.Y.1982).

### Federal Constitutional Challenge

Defendants challenge Pennsylvania's Wiretap Statute as violative of the federal

---

**1.** Our reference to "defendants" indicates that all defendants have joined in all pre-trial motions.

constitution because it purportedly creates a constitutional imbalance, *see e.g., Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967) (Harlan, J. concurring), and deprives citizens of due process by granting state law enforcement personnel specified rights while denying similar rights to others. Further, because the statute contains no severability clause, defendants assert that the entire enactment is constitutionally infirm.

Specifically, defendants point out that 18 Pa.Con.Stat.Ann. § 5704(2)(i) permits law enforcement officers to record conversations in which they are involved but that 18 Pa.Con.Stat.Ann. § 5703(1) deprives others of this same opportunity. Worse, ordinary citizens who record their conversations without the knowledge of the person with whom they are speaking commit a criminal offense. *Id.* Hence, defendants asseverate that Pennsylvania law enforcement officers can selectively record incriminating conversations and thereby entrap unwary citizens. Citizens, however, possess no correlative right to record their exculpatory conversations. Therefore, defendants contend that Pennsylvania's statutory scheme places citizens and potential defendants at an unconstitutional disadvantage by forcing them to either commit a crime by recording conversations or submit to possible entrapment. Because the statute lacks any severability clause, this constitutional deficiency purportedly imbues the entire legislation. Accordingly, defendants urge that it is irrelevant that the government will not seek to introduce any so-called "consentually monitored" conversations at trial.

Rather than reach the constitutional issue, we will *assume* the unconstitutionality of the challenged portions of the Act and determine whether this hypothesized infirmity is fatal to the entire statute.[2]

■ Pennsylvania provides that statutes are "presumed severable", *Stoner v. Presbyterian University Hospital,* 609 F.2d 109,

112 (3d Cir.1979), so long as the stricken portion is not "essentially and inseparably connected with" other sections of the enactment. 1 Pa.Con.Stat.Ann. § 1925. Importantly, whether a state statute is capable of severance presents a question of state, not federal, law. *Eisenstadt v. Baird,* 405 U.S. 438, 442, 92 S.Ct. 1029, 1032, 31 L.Ed.2d 349 (1972); *Commonwealth Department of Education v. First School,* 471 Pa. 471, 370 A.2d 702, 707 (1977). *See also, Graham v. Hill,* 444 F.Supp. 584, 594 (W.D.Tex.1978).

■ Our obligation is to determine whether Pennsylvania would have enacted the purportedly unconstitutional provisions of the Wiretap Act, 18 Pa.Con.Stat.Ann. §§ 5703(1) and 5704(2)(i), without passing the remainder of the legislation. The statutorily mandated objective is to determine "legislative intent", 1 Pa.Con.Stat.Ann. § 1925, the difficulty of which is obvious given the fact that the legislative body keeps no record of floor debates. *Rhode Island Federation of Teachers v. Norberg,* 630 F.2d 855, 863 (1st Cir.1980). We are not, however, without guidance. *See,* 1 Pa. Con.Stat.Ann. §§ 1921–1939 (providing the method by which statutes must be construed). The Pennsylvania legislature has instructed courts that legislative intent is properly divined by reference to the statute at issue where the enactment is expressed in "clear" terms, "free from all ambiguity". 1 Pa.Con.Stat.Ann. § 1921(b). Indeed, in *Commonwealth v. Hammond,* —— Pa.Super. ——, 454 A.2d 60, 61–2 (1982), the Superior Court, without specific reference to this rule of statutory interpretation, construed portions of the Wiretap Act according to their plain meaning.

In the case at bar, the statute provides a specific method by which designated law enforcement officials apply for an order authorizing wire interception, 18 Pa.Con. Stat.Ann. § 5709, which order is available only when investigating specific crimes. 18 Pa.Con.Stat.Ann. § 5708. Moreover, the

---

**2.** Our declination to decide the constitutional issue is grounded in the fact that "constitutional issues should not be decided and legislation should not be invalidated, if a controversy may be resolved on some other ground". *Babcock*

*& Wilcox v. Marshall,* 610 F.2d 1128, 1137 (3d Cir.1979), citing, *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J. concurring).

Superior Court Judge who authorizes the interception may only do so upon a "determination" that there is probable cause to believe that a number of delineated conditions exist. 18 Pa.Con.Stat.Ann. § 5710.

These guarantees of judicial oversight apply to the interception of wire communication and do not govern the conduct of law enforcement officers who record conversations to which they are a party. In other words, the detailed requirements of the Wiretap Act which relate to the application for, and conduct of, a wiretap, apply to those situations in which law enforcement personnel intercept conversations between third persons. They have no impact upon the recording or interception of conversations where the recording official is a party to the discussion. *Compare,* 18 Pa.Con.Stat. Ann. §§ 5704 with 5708–12. Simply stated, the cited provisions of the Wiretap Act relate to different types of governmental activity. On one hand, the statute provides for intense judicial scrutiny of law enforcement personnel who surreptitiously intercept the conversations of third parties. On the other hand, the statute generally authorizes the interception of conversations in which law enforcement officials are participants.

Because different statutory subsections regulate different types of governmental conduct, we conclude that even if a constitutional imbalance exists as to one subsection of the statute, the other subsection is properly severable and not adversely affect-

ed. We accordingly "find" that the facially unchallenged portion of the Wiretap Act is not "essentially and inseparably connected with, or ... dependent upon" the challenged provision. Moreover, absent the challenged provision, the Act is not "incomplete and incapable of being executed in accordance with the legislative intent". 1 Pa.Con.Stat.Ann. § 1925. Therefore, the challenged subsections of the Act, 18 Pa. Con.Stat.Ann. §§ 5703 and 5704, are severable from the remaining portions thereof and any constitutional deficiency in those sections does not permeate the entire legislation. This conclusion warrants denial of the motion to suppress on federal constitutional grounds.[3]

### State Constitutional Challenge

■ Defendants, still moving to suppress, argue that irrespective of any federal constitutional deficiency, the Wiretap Act offends the aegis of the Pennsylvania Constitution[4] and must be declared unconstitutional under state standards. Undoubtedly, states may impose "higher standards on searches and seizures" than required by the United States Constitution. *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). *See also, Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) (States may adopt constitutional provisions which protect individual liberties "more expansive[ly]" than the Federal Constitution); *Davis v. Board of Medical Examiners,* 497

---

**3.** Defendants also complain that the Wiretap Act improperly and in unconstitutionally vague language authorizes wiretaps "necessary under the circumstances" which shall terminate "as soon as practicable". 18 Pa.Con.Stat.Ann. § 5712(b). The alleged statutory infirmities are that the quoted language is too vague to permit a rational interpretation by either an issuing judge or a reviewing court and, additionally, that the statute permits a greater governmental intrusion than is permissible under the correlative portions of the federal act. *See,* 18 U.S.C. § 2518(5) (Wiretaps must not extend beyond time "necessary to achieve the objections of the authorization".) We perceive no principled, qualitative distinction between the purportedly vague and unconstitutionally expansive Pennsylvania Act and the unchallenged federal one. Therefore, we reject defendants'

argument. *Cf., Gormley v. Director,* 632 F.2d 938 (2nd Cir.1980), *cert. denied,* 449 U.S. 1023, 101 S.Ct. 591, 66 L.Ed.2d 485 (1980) (Turning aside First Amendment and overbreadth challenges to a statute which criminalizes phone calls made with the intent to "harass, annoy or alarm".); *United States v. Lampley,* 573 F.2d 783 (3d Cir.1978) (same holding).

**4.** Article I, § 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

F.Supp. 525, 528 (D.N.J.1980) (State constitutional provisions must be given effect where they are more solicitous of analogous rights secured by the First Amendment). *See generally, Oregon v. Hass,* 420 U.S. 714, 719–20, 95 S.Ct. 1215, 1219–20, 43 L.Ed.2d 570 (1975) (Distinguishing between the deference accorded to state court interpretations of state and federal constitutional guarantees.)

Pennsylvania courts have occasionally interpreted the state constitution as establishing individual rights broader than those which exist under the federal constitution. *But see, Commonwealth v. Chaitt,* 176 Pa. Super. 318, 107 A.2d 214 (1954). For example, in *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283, 1289 (1979), the Pennsylvania Supreme Court expressed its concern that the decision in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), represented a "dangerous precedent, with great potential for abuse" and declined to follow the case when construing the state constitution. Thus, Pennsylvanians have an expectation of privacy in their banking records which others do not similarly enjoy. Additionally, statements seized in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are admissible for impeachment purposes in a federal prosecution, *Harris v. New York,* 401 U.S. 222, 228, 91 S.Ct. 643, 647, 28 L.Ed.2d 1 (1971), but are inadmissible for like purposes in a state prosecution. *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62, 64 (1975). Defendants argue that these cases demonstrate that the Pennsylvania Constitution more zealously guards individual rights than does the federal one and that application of the stricter state standard compels the conclusion that the Act violates the state constitution. We disagree.

■ We begin our analysis with the observation that the Commonwealth's legislation enjoys a presumption of constitutionality, 1 Pa.Con.Stat.Ann. § 1922(3), and that doubts are to be resolved in favor of such a finding. *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932, 937 (1978). *Cf., Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives ... know the law ..."). Finally, although we are not *bound* by a recent decision of the Court of Common Pleas, *Commonwealth v. Baldassari,* No. 82–10400 (CCP Lycoming County), which sustained the statute against a similar challenge, we nevertheless conclude that the analysis contained therein is entitled to appropriate consideration. *See, Commissioner v. Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967) (Federal courts interpreting state law should give "proper regard" to relevant rulings of lower state courts.) *Cf., United States v. Manfredi,* 488 F.2d 588, 598 (2nd Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974) (In the absence of "dispositive" or "indicative" state law, application of federal law is appropriate.) With this contextual framework for our analysis, we consider the Wiretap Act and whether it violates the relevant provision of the State Constitution, Art. I, § 8.

Defendants, citing *Commonwealth v. Papszycki,* 442 Pa. 234, 275 A.2d 28 (1971), assert that Pennsylvania's prior law forbade wiretaps of "every description" and that this prohibition was "vigorously enforced"; therefore, they contend, "any" legislation which permits the interception of wire communications is *per se* violative of Pennsylvania's Constitution. We think that this argument reads too much into *Papszycki,* generally misstates the law of Pennsylvania, and ignores recent appellate court authority.

*Papszycki,* contrary to defendants' assertion, provides no illumination of the constitutional issue at bar. The court there considered whether affixing an induction coil device to a telephone receiver and thereby amplifying conversations constituted an impermissible wiretap in contravention of then existing state law. Reasoning that the now repealed statute prohibited the interception of wire communications "without permission of the parties to such communication", the court concluded that mutual consent to intercept was required. *Id.* at 237–38, 275 A.2d 28. *See also, Common-*

wealth v. Murray, 423 Pa. 37, 43–49, 223 A.2d 102 (1966). Specifically, the court's analysis centered on the plural "parties" and reasoned that one "party" could not properly intercept a wire communication absent an agreement with the other "party". Commonwealth v. Papszycki, 442 Pa. at 237, 275 A.2d 28. Therefore, the court suppressed the intercepted statements. Indeed, this analysis of Papszycki is confirmed by Commonwealth v. Baldwin, 422 A.2d 838, 845–46, 422 A.2d 838 (1980), which also considered the same, now repealed, statute.

Although Pennsylvania courts have solicitously guarded the rights of the Commonwealth's citizens, the cases fail to demonstrate that "any" statute authorizing a wiretap is unconstitutional. True, in eloquent dictum, Justice Musmanno observed that the "right to be let alone", as expressed in Art. I, § 8 of the state constitution, would be violated

> if detectives and private intermeddlers, [could] without legal responsibility, peer through keyholes, eavesdrop at the table, listen at the transom and over the telephone, and crawl under the bed[.] [T]hen all constitutional guarantees [would] become [a] meaningless aggregation of words, as disconnected as a broken necklace whose beads have scattered on the floor.

Commonwealth v. Murray, 423 Pa. at 51–2, 223 A.2d 102 (emphasis added). This and other equally expressive and colorful language by Justice Musmanno, expresses the traditional notion that citizens possess privacy rights. See e.g., Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1972). Murray, upon which defendants rely, cannot be read to indicate that "any" statute authorizing wire interceptions violates the Pennsylvania Constitution. The portion of Murray quoted above discusses the evils of eavesdropping and wiretapping "without legal responsibility". The legislation at bar, however, allocates specific legal

responsibilities to judges, law enforcement agents and prosecutors. See, 18 Pa.Con. Stat.Ann. §§ 5708–23.

■ Murray also observed that "[w]ere it not for" specified legislation "irresponsible agencies" could "tap wires". The court also observed that "[w]ithout the [now repealed] Act of 1957 ... malevolent scandalmonger[s]" could dine at the "banquet table of the most guarded secrets". Commonwealth v. Murray, 423 Pa. at 52, 223 A.2d 102. These statements, to the extent they are not dictum, demonstrate that absent prophylactic legislation, wiretapping and eavesdropping might continue unabated. In other words, Pennsylvania's Constitution, unaided by, and unadorned with, appropriate legislation is, by itself, apparently incapable of preventing wiretapping. Therefore, defendants' suggestion that "any" statute which authorizes and regulates wiretapping is necessarily repugnant to the Constitution is erroneous. Simply stated, if the Constitution does not prevent wiretapping, passage of a statute authorizing its use does not ipso facto violate the same document.

The Commonwealth's post-Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), construction of Art. I, § 8[5] demonstrates that Pennsylvania has barred the introduction of illegally seized evidence from its courts. Commonwealth v. Smyser, 205 Pa.Super. 599, 211 A.2d 59 (1965). In fact, Pennsylvania is bound by and adheres to the "general rule" that illegally obtained evidence is inadmissible against a criminal defendant. Commonwealth v. Romberger, 474 Pa. 190, 378 A.2d 283, 286 (1977).

The state courts have, however, also taken pains to insure against any "unwarranted extension of the exclusionary rule". Commonwealth v. Bennett, 245 Pa.Super. 457, 369 A.2d 493, 494 (1976). In Bennett, a legally authorized New Jersey wiretap yielded information upon which Pennsylvania authorities predicated probable cause to

---

**5.** Prior to Mapp, an intermediate appellate court refused to suppress wiretap evidence which was admittedly seized in violation of the Pennsylvania and United States Constitutions. Commonwealth v. Chaitt, 176 Pa.Super. at 322, 107 A.2d 214. In so holding, the court recognized, but declined to follow, the federal rule expressed in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which was more protective of the rights of individuals.

obtain a warrant. The court recognized that the New Jersey wiretap statute authorized conduct which would be illegal in Pennsylvania but nevertheless failed to suppress the evidence. Reasoning that Pennsylvania lacked the authority to regulate conduct in New Jersey, *Bennett* concluded that a judicial prohibition on the "exchange of information" between law enforcement agencies of sister states "cannot be justified". *Id.* Recognizing its obligation to "extend to all people the protection of constitutional safeguards", *Bennett* held that "[n]o law of this Commonwealth was violated, ... the rights of our citizens were not infringed" by the use of wiretap evidence in a Pennsylvania court. *Commonwealth v. Bennett,* 369 A.2d at 494–95, *Accord, Commonwealth v. Inadi,* 303 Pa.Super. 409, 449 A.2d 753 (1982) (Applying *Bennett* to an extradition hearing). *See also, Commonwealth v. Corbo,* 295 Pa.Super. 42, 440 A.2d 1213 (1982).

Given the Commonwealth's hearty endorsement of the "general rule" prohibiting the introduction of illegally seized evidence, *Commonwealth v. Romberger,* 378 A.2d at 286, it would be anomalous in view of the growing *Bennett* line of cases, to conclude that the Pennsylvania Constitution would be offended by "any" statute authorizing wire interceptions. Defendants' inability to forcefully articulate a legal theory as to how the current Wiretap Act violates Art. I, § 8 of the state constitution, coupled with our analysis of the Pennsylvania cases, including *Baldassari,* and the statutory presumption of constitutionality, 1 Pa.Con. Stat.Ann. § 1922(3), justifies our conclusion that the Wiretap Act is not violative of the Pennsylvania Constitution. Accordingly, we shall deny the motions to suppress which so contend.

## Challenges Relating to the Acquisition of the Order Authorizing Wire Interceptions

■ Under both federal, 18 U.S.C. § 2518(3)(a), and state law, 18 Pa.Con.Stat. Ann. § 5710(a), an order authorizing interception of wire communications may only issue upon a finding that "probable cause" exists as to a number of delineated events.

Whether an affidavit, sworn in connection with an application for a warrant, contains "probable cause" requires consideration of whether the

> facts set forth ... and the inferences that could properly be drawn therefrom established a substantial basis to permit a neutral and detached magistrate ... to conclude that

prohibited activity was occurring. *United States v. Zurosky,* 614 F.2d 779, 787 (1st Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980). When engaging in this *post-hoc* determination, courts are reminded that the issuing judicial officer may indulge "normal inferences drawn from the surrounding circumstances", *United States v. Brown,* 584 F.2d 252, 256 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979), and are cautioned to avoid a hyper-technical construction of the affidavit. In fact, affidavits are to be tested by a common sense and realistic interpretation. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *United States v. Flores,* 679 F.2d 173, 176 (9th Cir.1982), *United States v. Seta,* 669 F.2d 400, 402 (6th Cir.1982).

■ Consistent with these principles, "erroneous assumptions" contained in an affidavit do not necessarily vitiate an otherwise valid warrant, *United States v. Smith,* 588 F.2d 737, 739 (9th Cir.1978), *cert. denied,* 404 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979), the issuing authority's findings are entitled to deference, *United States v. Martino,* 664 F.2d 860, 867 (2nd Cir.1981), and doubts should be resolved in favor of sustaining their conclusions. *United States v. Allen,* 588 F.2d 1100, 1106 (5th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). Most importantly, however, the high degree of deference accorded the issuing judicial officer's conclusions should never obstruct a reviewing court from taking "great care" to insure that probable cause actually existed when the warrant issued. *United States v. Lockett,* 674 F.2d 843, 846 (11th Cir.1982). *See also, United States v. Tucker,* 481 F.Supp. 182, 187 (E.D.N.Y.1979). Finally, courts should never permit themselves to become a

"rubber stamp for the police". *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964).[6]

Defendants attack the affidavit submitted in support of the wiretap application and assert that it impermissibly fails to set forth specific, reliable facts upon which Judge Cavanaugh could have concluded that probable cause existed to tap the DeAngelis phone. Continuing, defendants urge that the affiant knowingly and intentionally, or with a reckless disregard for the truth, made false statements in securing the wiretap authorization. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Finally, defendants asseverate that suppression is required because of the affiant's dual failure to either identify co-conspirators or to establish that normal investigative procedures have failed, appear unlikely to succeed or are too dangerous to employ. 18 Pa.Con. Stat.Ann. §§ 5709(3)(i) and (vii). We now consider these contentions.

▮ Whether the affidavit contains sufficient factual information upon which to make a finding of probable cause requires reference to the challenged document itself and a determination of whether it satisfies the requirements of *Aguilar v. Texas,* 378 U.S. at 114, 84 S.Ct. at 1514 and *Spinelli v. United States,* 393 U.S. 410, 412, 89 S.Ct. 584, 586, 21 L.Ed.2d 637 (1969). In recently exploring these cases, the Third Circuit observed that

> in *Aguilar,* the court held that probable cause may be established on the basis of hearsay—for example, by an affidavit of a law enforcement officer that relies entirely on an informant's tip. However, to ensure that it is the magistrate, not the informant or the officer, who decides whether probable cause exists, the *Aguilar* Court held that such a hearsay affidavit must meet a two-pronged test. First,

the affidavit must contain facts sufficient to support the finding that the informant based his conclusions on adequate knowledge. Secondly, the affidavit must recite facts, not mere conclusory assertions of the officer, which demonstrate the credibility of the informant. The magistrate may base probable cause for a warrant exclusively on an informant's tip only when facts demonstrating both the informant's basis of knowledge and his credibility are specified in the officer's affidavit.

*United States v. Marino,* 682 F.2d 449, 452 (3d Cir.1982), quoting, *United States v. Bush,* 647 F.2d 357, 362 (3d Cir.1981). (citations omitted.) In other words, to satisfy the *Aguilar-Spinelli* test, an affidavit, which relies *solely* upon a hearsay tip, must disclose the underlying facts sufficient to establish both probable cause and the credibility of the informant. Where, however, the affidavit relies upon a mixture of an informant's hearsay tip and other information, a tip which arguably fails to satisfy the articulated test should not be disregarded so long as it is supported by sufficient corroboration. *United States v. Sanchez,* 689 F.2d 508, 512–13 (5th Cir.1982); *United States v. Bush,* 647 F.2d at 363; *United States v. Sporleder,* 635 F.2d 809, 812 (10th Cir.1980); *United States v. Tucker,* 481 F.Supp. at 186–87.

▮ In the case at bar, defendants attack the twenty-four page affidavit upon which Judge Cavanaugh based his finding of probable cause. A fair reading of the entire document, however, supports the government's position that the warrant properly issued. Briefly, the affidavit establishes that Agent Kutney, the affiant, is an experienced investigator with Pennsylvania BNIDC and that he based his sworn application upon information received from (1) a confidential informant who gave statements against his penal interest,[7] (2) the

---

6. Pennsylvania law is substantially similar to this aspect of federal law. *See, Commonwealth v. Stamps,* 493 Pa. 530, 427 A.2d 141, 144 (1981).

7. Defendants asseverate that the confidential informant's statements are not properly statements against his penal interest because they

were made as part of a plea negotiation and could not be used as evidence against the confidential informant. Fed.R.Crim.P. 11(e)(6).

Although we agree that statements made against penal interests should be viewed with caution, *United States v. Oliver,* 626 F.2d 254, 261 (2d Cir.1980); *United States v. Dorfman,*

consensual interception of telephone and wire communications between himself and defendant Geller, (3) the analysis of data derived from a court-approved pen register placed on the DeAngelis phone, (4) Pennsylvania motor vehicle records, and (5) visual observations of other BNIDC agents.

Specifically, Agent Kutney averred that the confidential informant reported to him that he had purchased heroin from defendant Geller who made the "necessary arrangements" by contacting his source of supply by telephone. In February and April, 1981, the affiant purchased packets of heroin from Geller who stated that his source of supply was "Tony" and that "Tony" could supply "any amount of heroin". Thereafter, in May, 1981, the confidential informant called Geller and indicated that he again wished to purchase heroin. The next day Geller returned the call and stated that the deal with "Tony" had been set. Importantly, a review of Geller's telephone records reveals that during the critical time in May when the heroin

transaction was being negotiated, two calls were made to the phone of defendant Peck.[8] These same records reveal that defendant Geller placed fifteen telephone calls to the Peck residence over a five-month period, from December 6, through May 6, 1981.

Beginning in July, 1981, pursuant to a determination made by a Pennsylvania Deputy Attorney General, the bulk of the conversations between Agent Kutney and Geller were recorded. Approximately five weeks later, Kutney had four conversations with Geller during which time Geller referred to his "source" on three separate occasions and further indicated that he, Geller, could sell Kutney one and one-half grams of heroin for nine hundred dollars. At approximately 2:40 P.M. on a specified date, Kutney paid Geller for the heroin. Thereupon, Geller left the scene and returned forty-five minutes later. During Geller's absence, BNIDC agents observed his car at the Peck residence.

 Shortly thereafter, Geller returned to Kutney's car and conveyed the

542 F.Supp. 345, 364 n. 13 (N.D.Ill.1982), we reject the notion that statements made by a confidential informant in the presence of an attorney cannot be considered as against his penal interest. *See e.g., United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971) (Desires to obtain a "break" from the authorities which motivate admissions of criminal conduct contain a sufficient "residual risk" and carry their own "indicia of credibility".) *Accord, United States v. Davis,* 617 F.2d 677, 693 (D.C.Cir.), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1979); *United States v. Hunley,* 567 F.2d 822, 825 (8th Cir.1977).

In any case, defendants read Fed.R.Crim.P. 11(e)(6) too broadly. The affidavit states that the confidential informant's admissions were made during an "interview" and in "the presence of [his] attorney". *See* Kutney Affidavit, p. 4, ¶ 2. Rule 11(e)(6) does not, by its terms, protect such statements. Specifically, the rule deems inadmissible only a plea of guilty which is subsequently withdrawn, a plea of *nolo contendere,* statements made in the course of a Rule 11 colloquy which result in a plea of guilty or *nolo contendere,* or statements made during plea negotiations with a government attorney, unless a plea of guilty is entered and not withdrawn. Finally, Rule 11 affords no protection to such statements when "fairness" so dictates or in a perjury prosecution. *See generally,* 8 Moore's Federal Practice ¶ 11.08[2].

Here, the confidential informant neither tendered and subsequently withdrew a guilty plea nor plead *nolo contendere.* Moreover, the statements at issue were not made during a Rule 11 colloquy with any court and, most importantly, were not made during plea negotiations with a "government attorney". There is simply no evidence that the statements made to Agent Kutney, a government *investigator,* were made in contemplation of any eventual guilty plea by the declarant. Such statements do not enjoy the shield which Rule 11(e)(6) provides to related admissions. *United States v. Cross,* 638 F.2d 1375, 1380 (5th Cir.1981).

8. The affidavit repeatedly refers to the "Peck/DeAngelis residence" and the "Peck/DeAngelis phone" notwithstanding the fact that there was no evidence, in the early part of the investigation, that defendants Peck and DeAngelis shared a home or a phone. However, for the reasons which we articulate *infra,* we do not consider these misstatements fatal to the warrant. In our recitation of the affidavit's contents, we refer initially to the subject residence and phone as belonging to defendant Peck. Once evidence of defendant DeAngelis' involvement in the Peck residence and phone is legitimately established within the affidavit, we will refer to same as belonging to co-defendants "Peck/DeAngelis".

heroin to him. During this part of the transaction, Geller remarked that "his source" had just left his residence on a black Harley-Davidson motorcycle enroute to a "stash house". Most importantly, Agent Kutney later determined that a 1980 Harley-Davidson motorcycle was registered to Anthony DeAngelis at R.D. 1, Pine Road, Boyertown,[9] previously referred to as the "Peck residence". On the next day, while consummating another transaction, Geller remarked that he had to be at his "source's" house in fifteen minutes. Approximately seventeen minutes later Geller's car was observed at the Peck/DeAngelis residence.

█ Subsequently obtained telephone records show that calls were made between the Geller and Peck/DeAngelis phones during those times when Geller was obtaining heroin which formed the basis of the illicit Geller-Kutney transactions. Additional telephone record analysis, "matched" with Kutney's recollections of his conversations with Geller, further reveal that on September 1, 1981, at approximately 7:15 P.M., Geller called "Tony" in the presence of the affiant, Kutney. At that time, Geller reported that although "Tony" was not home, he, Geller, had nevertheless placed an order for two grams of heroin. Relevant telephone records demonstrate that the Peck/DeAngelis phone received a call from the Philadelphia area at the same time that Geller called "Tony" from that geographic region.

The affidavit then recites that Geller reported to Kutney that he had been purchasing heroin from "Tony" for a number of years, that "Tony" keeps his heroin supply at his sister "Betty's" house and that

"Tony", unemployed but "rolling in money", was involved in drug smuggling. Continuing, the affidavit relates an additional heroin transaction on September 12, 1981; a telephone pen register "matches" a series of calls between Geller and the Peck/DeAngelis phone around the same time that arrangements to complete the transaction were purportedly being made. Likewise, BNIDC surveillance units observed Geller at the Peck/DeAngelis residence during the critical period.

Five days later, on September 17, 1981, an additional transaction was arranged. On the next day, Geller reported to Kutney that he would be calling his "Boyertown source" at 11:00 A.M. to arrange the deal. Telephone records establish that at 10:56 A.M. on the date in question, the Peck/DeAngelis phone received an incoming call from the relevant switching station. The frequently attested to series of events then reoccurred; Geller met Kutney and took his money, he then departed the meeting place and was observed at the Peck/DeAngelis Boyertown residence and, finally, returned with heroin for Kutney. This same pattern of events again occurred on September 24, 1981.

Defendants mount an attack upon the authorizing judge's conclusion that a facial review of the affidavit establishes probable cause. Next, the defendants complain that a culmination of hypothesized *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2676, violations eviscerate any notion that probable cause was properly established. We reject these two contentions for the reasons set forth below.

First, the affidavit facially details Kutney's long-term investigation into illegal drug distribution.[10] It then establishes that

---

9. Defendants attack the vehicle registration information which ties defendant DeAngelis to the Peck household as being stale and therefore incompetent to "count" toward probable cause.

Questions of staleness depend upon the "nature of the activity . . . and require review on a case-by-case basis", *United States v. Harris* 482 F.2d 1115, 1119 (3d Cir.1973), and turn upon the "particular circumstances of each case". *United States v. Diecidue,* 603 F.2d 535, 560 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). In the case at bar, we conclude that the vehicle registration information which "tied" defendant DeAngelis

to the Peck residence at Boyertown is neither untimely nor stale. Given the fact that Pennsylvania requires the registration of motorcycles, 75 Pa.Con.Stat.Ann. § 1302, and that the state must be notified within fifteen days of any change of address, 75 Pa.Con.Stat.Ann. § 1312, the relied upon information is, indeed, quite timely. *See, United States v. Tucker,* 481 F.Supp. at 187. (The address listed on a driver's license may be considered in determining whether, for probable cause purposes, the identified individual lives at the stated address.)

10. Although the veracity and reliability of the confidential informant is not set forth in ac-

Geller's source was "Tony" and that Geller contacted his source by telephone. Matching conversations of the relevant dates with telephone toll and pen register records establishes reason to believe that Geller called the Peck/DeAngelis phone when attempting to arrange drug transactions. This theory is further supported by observation of Geller's presence at the Boyertown residence between the time that he received Kutney's money and the time that he returned with the heroin.

Finally, the motorcycle registration ties DeAngelis to the Boyertown home and provides a critical link between defendant DeAngelis and the phone which was eventually monitored. We, therefore, conclude that the affidavit sets forth sufficient facts to warrant a finding of probable cause.

■ We now consider whether the affidavit establishes probable cause after excising various knowing misstatements assertedly contained therein. In *Franks v. Delaware,* 438 U.S. at 155–56, 98 S.Ct. at 2676, the Supreme Court held that defendants who show by a "preponderance" that an affidavit submitted in support of an application for warrant contains false statements made "knowingly and intentionally", or with a "reckless disregard for the truth", are entitled to have the false material "set to one side" and have the remaining portions of affidavit reviewed for a determination of whether probable cause existed when the warrant issued. Where defendants make such a showing and the reviewing court determines that the valid, unaffected portions of the affidavit do not rise to the level of probable cause, suppression is the appropriate remedy. *United States v. Axselle,* 604 F.2d 1330 (10th Cir.1979), interpreting *Franks,* held that the existence of "troublesome" affidavit errors does not necessarily vitiate an otherwise valid warrant and that *Franks* did not signal a retreat from the well-established rule that affidavits, frequently prepared under the "pres-

sures of time", must be considered in a "common sense and realistic manner". *Id.* at 1336. This standard specifically applies to affidavits seeking permission to install a wiretapping device. *In Re DeMonte,* 674 F.2d 1169, 1173 (7th Cir.1982).

■ In the case at bar, defendants inveigh against a number of misstatements which they term "knowing". For example, testimony adduced at the suppression hearing demonstrates that portions of Kutney's sworn statement were either incorrect or so poorly worded as to be subject to a variety of interpretations. The affidavit states that

> [t]he confidential informant further identified one of Geller's sources of supply for heroin and other drugs as Anthony DeAngelis a/k/a "Tony", a white male born on April 26, 1943, who resides at the aforementioned Boyertown R.D.1 address.

At the hearing, Agent Kutney testified that, contrary to a plain reading of the affidavit, the confidential informant never identified DeAngelis by full name, description, address or date of birth. In fact, the confidential informant simply referred to his source as "Tony".

The government, conceding that the challenged portion of the affidavit is "clumsy and ambiguous" and subject to a variety of constructions, urges that Kutney simply and inadvertently linked the confidential informant's "Tony" to other information generated through investigative techniques.

Additionally, defendants attack Kutney's paraphrasing of conversations which he had with Geller on August 27 and September 6, 1981. The affidavit states that the conversations concerned

> additional purchases of heroin from his [Geller's] Boyertown source previously identified as "Tony". During these conversations, Geller stated that he in turn

cordance with the dictates of *Aguilar,* the information provided is not automatically rendered incompetent so long as the "more elaborate test" of *Spinelli* is satisfied. *See, United States v. Tucker,* 481 F.Supp. at 186–187. Specifically, the confidential informant is corroborated

by Geller's remarks, statements against penal interest, visual observation by the BNIDC agents, and the motorcycle vehicle registration. However, out of an abundance of caution, we have declined to consider the information provided by the informant.

had been in frequent telephone contact with "Tony" to make tentative arrangements for the purchase of two grams of heroin at a cost of approximately $550 per gram.

Testimony adduced at the hearing established, however, that Kutney supplied the word "Tony" which appears in the affidavit and that, up until this time, Geller had not yet identified his source by name. According to defendants, this same paraphrasing and purported misleading use of quotes renders invalid Kutney's sworn recollection of conversations on September 7, 11, 18 and 24, 1981.

Defendants conclude with the assertions that in light of Kutney's training and the admitted importance of guaranteeing the accuracy of affidavits, the challenged misstatements evidence, at the very least, a knowing disregard for the truth. More importantly, absent the manufactured and frequent use of "Tony" in the affidavit, also improperly identified as the "Boyertown source", the critical link between defendant DeAngelis and the Boyertown phone is nonexistent. Hence, they conclude that there was no probable cause to intercept the calls.

Even *assuming* our concurrence with defendants' characterization of the admitted misstatements, we conclude that the affidavit nevertheless establishes sufficient probable cause to warrant the wire interception. Specifically, the "untainted" allegations establish that on August 13, 1981, Kutney called Geller four times at a phone which, records reflect, was used to call the eventually tapped phone. After the Kutney-Geller conversations, the two parties met, Geller left Kutney and said that he would return with heroin. Within a half hour, Geller's car was observed at the Boyertown residence and, twenty minutes later, Geller returned to Kutney. This pattern of activity is substantially similar to the events which occurred each time Kutney purchased heroin from Geller.

Moreover, Geller did refer to his source as "Tony", albeit not as frequently as the affidavit states, and further indicated that his source had a motorcycle. Motor vehicle records confirmed that "Anthony DeAngelis" owned a motorcycle and that it was registered at the Pine Road, R.D. 1, Boyertown address. This is the same address at which Geller's car had been observed while that defendant consummated heroin sales with Kutney. The phone contained therein had also received calls from Geller during the time that Geller told Kutney that he, Geller, was arranging the sales.

These factual averments establish probable cause to believe that the telephone in question was being used in connection with a relevant criminal offense. See, 18 Pa. Con.Stat.Ann. § 5710(a)(4) and 18 U.S.C. § 2518(3)(d).

 Defendants next argue that irrespective of the arguable existence of probable cause to intercept wire communications at the Peck/DeAngelis residence, the affidavit fails to demonstrate that "normal investigative procedures . . . have been tried and have failed . . . appear unlikely to succeed . . . or are to dangerous to employ". 18 Pa.Con.Stat.Ann. § 5709(3)(vii). Specifically, defendants point out that the Peck/DeAngelis Boyertown residence is located in a rural area, adjacent to a farm. They argue that government agents should have contacted the neighboring farmer and posed as "farm hands" while, in fact, engaging in covert long-range photographic or other surveillance. Defendants also claim that the purportedly common investigative technique of undercover agents infiltrating the criminal enterprise or seeking to "turn" a participant thereof, such as Geller, into an informant, should have been tried.

Here again, the government's showing must be tested against a "pragmatic" standard. *United States v. Vento*, 533 F.2d 838, 849 (3d Cir.1976). *Accord, United States v. Atkins*, 618 F.2d 366, 371 (5th Cir.1980) ("Other investigative techniques" is subject to a "commonsense" interpretation); *United States v. Bailey*, 607 F.2d 237, 241–42 (9th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980) (The requirement of demonstrating other investigative techniques should be construed in a "practical and common sense" fashion, and need not be used only as a last resort);

United States v. Williams, 580 F.2d 578, 588 (D.C.Cir.), cert. denied, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1980) ("impractical[ity] standard); United States v. Dorfman, 542 F.Supp. at 399 ("The government's burden of establishing its compliance . . . is not great".) (quotation omitted); United States v. Cale, 508 F.Supp. 1038, 1041–42 (S.D.N.Y.1981) (no requirement that electronic surveillance be used only after "every other imaginable method" has been exhausted). The short answer to defendants' assertion is this: the affidavit properly demonstrates that other techniques would have been too dangerous to employ. The law does not require undercover agents to necessarily reveal themselves to target defendants in the hope that they will "turn" against their confederates and inform on them. Likewise, in the case at bar, the agents were not required to reveal themselves to neighbors. If the neighboring farmers proved uncooperative they could have "blown" the agents' "cover". Worse, perhaps, cooperative neighbors could have exposed themselves to the physical and uncertain risks incident to law enforcement. United States v. Hyde, 574 F.2d 856, 868–69 (5th Cir.1978). Finally, the affidavit sufficiently establishes that the rural nature of the residence precluded any long-term surreptitious surveillance of the Boyertown home.[11]

## Challenges Relating to the Execution of the Order Authorizing Wire Interceptions

We now turn from issues which relate to the application for, and acquisition of, the tap and address the contentions that the execution of the tap was improper. Defendants argue that the agents overseeing the wiretap failed to minimize irrelevant conversations, engaged in conduct violative of the spousal privilege, failed to serve inventories in a timely manner and improperly filed conclusory progress reports with the supervising judge. We consider these arguments seriatim.

The alleged failure to minimize presents a number of issues, the vast majority of which are properly decided by reference to Scott v. United States, 436 U.S. 128, 129, 98 S.Ct. 1717, 1719, 56 L.Ed.2d 168 (1978). There, the court espoused an approach whereby the reasoned judgment of law enforcement personnel properly governs the ad hoc resolution of those problems realistically encountered when minimizing. Most pertinently, the court observed that

[i]n a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed. A large number were ambiguous

11. Defendants also argue that both the wiretap application and the authorizing order are defective because each fails to "identify the particular person, if known, committing the offense". See, 18 Pa.Con.Stat.Ann. §§ 5709(3)(i), 5712(a)(2) and the federal counterparts, 18 U.S.C. §§ 2518(1)(b)(iv), 2518(4)(a).

Interpreting the federal statute, United States v. Donovan, 429 U.S. 413, 428, 97 S.Ct. 658, 668, 50 L.Ed.2d 652 (1977), held that the "if known" provision requires identification of those individuals whom the government has "probable cause to believe . . . [are] engaged in the criminal activity under investigation and expects to intercept . . . over the target phone". (emphasis added). See also, United States v. Kahn, 415 U.S. 143, 155, 94 S.Ct. 977, 984, 39 L.Ed.2d 225 (1974). Only those "known" conspirators need be identified. United States v. Almonte, 594 F.2d 261, 264 (1st Cir.1979).

In the case at bar, defendants have failed to demonstrate that "known" co-conspirators were omitted from the wiretap application and the subsequent order predicated thereon. True, Agent Livingston testified at the suppression hearing that BNIDC agents believed, when they applied for the wiretap, that a particular defendant "might well be a co-conspirator" and that they nevertheless failed to so advise the issuing judge. However, he also testified that although "the possibility definitely existed" that the agents knew prior to application for the wiretap that individuals unnamed in the application were co-conspirators, they were "by no means sure about any of them". See Testimony of Thomas Livingston, November 8, 1982, at 62–65. This testimony establishes that, prior to the wiretap application, BNIDC agents may have suspected the involvement of identified defendants in the scheme and that they failed to share their suspicions with Judge Cavanaugh. However, "suspicions" or even "strong reason to suspect" does not rise to the required level of "probable cause". Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959).

in nature, making characterization virtually impossible until the completion of these calls. And some of the nonpertinent conversations were one-time conversations. Since these calls did not give the agents an opportunity to develop a category of innocent calls which should not have been intercepted, their interception cannot be viewed as a violation of the minimization requirement.

*Id.* at 142, 98 S.Ct. at 1725. (footnote omitted).

One aspect of the minimization issue is, however, not subject to equally facile resolution. Indeed, considerable controversy has been generated with regard to the manner in which law enforcement personnel were instructed to comply with and implement Judge Cavanaugh's order. The judge's order permitted executing officers to intercept communications which "reveal the manner" in which Geller, DeAngelis and "others" participated in an "illegal drug distribution enterprise". It further directed seizure of those conversations which "reveal the identities of their confederates, their places and manner of operation, and the nature of the conspiracy involved". *See,* Judge Cavanaugh's order, ¶ 2. Continuing, the order paralleled 18 Pa.Con.Stat. Ann. § 5712(b) and mandated that interceptions terminate "as soon as practicable" and that the executing agents "minimize or eliminate the interception of such communications not otherwise subject to interception". Additionally, agents were directed to make "reasonable efforts, whenever possible, to reduce the hours of interruption". *Id.* at ¶ 3.

Defendants, focusing primarily upon the order's third paragraph, complain that the instructions which governed the conduct of executing agents and were promulgated by the Commonwealth's attorneys, permitted the seizure of conversations not contemplated by court order. Worse, defendants urge that the subject instructions are directly contrary to the Court's authorization. The challenged instructions provide that intercepting agents should seize the "entirety" of "any" conversation between those identified as conspirators. The articulated rationale was that the conversations "may turn pertinent at any time". *See,* Instructions, G2, ¶ 4.

Defendants urge that the broad instruction to seize the entirety of all conversations between conspirators is *ultra vires* the somewhat narrower court order which required minimization. Accordingly, they assert that suppression of all seized conversations is required. 18 Pa.Con.Stat.Ann. § 5721(b). *See, United States v. Turner,* 528 F.2d 143, 156 (9th Cir.1975) (Where it is "clear" that a minimization order was "totally disregarded" by the government, "total suppression might well be appropriate".)

This argument cannot, however, withstand principled scrutiny. First, and foremost, defendants' argument is too narrowly focused. It attempts to prove disobedience of the court order by scrutinizing one paragraph thereof and contrasting it with a single portion of the instructions issued to the executing agents. The order requires "minimization" of those communications "not otherwise subject to interception". Resolution of the issue at bar turns upon the latter phrase, "not otherwise subject to interception", and requires an understanding of its meaning. Paragraph 2 of the authorizing order supplies this; it authorizes interception of those conversations which "reveal the identities of confederates", the "manner of operation" and the "nature of the conspiracy". Therefore, in order to comply with the second paragraph of Judge Cavanaugh's order, agents were instructed to monitor the totality of conversations between conspirators in the hope of discerning the identities of all the conspirators, their mode of operation and the nature of the conspiracy. *See, United States v. Manfredi,* 488 F.2d at 600 (Considering minimization issue in light of the government's obligation to "ascertain the scope and extent of the drug conspiracy under investigation".)

Second, in determining whether proper minimization occurred, the focus of the inquiry centers upon the conduct of the executing agents, not their motives. *United States v. Feldman,* 606 F.2d 673, 678 (6th Cir.1979), *cert. denied,* 445 U.S. 961, 100

S.Ct. 1648, 64 L.Ed.2d 236 (1980). In the case at bar, the evidence fails to demonstrate that all calls between conspirators, both pertinent and non-pertinent, were intercepted. Granted, Agent Kutney testified that, according to his understanding, he was authorized to intercept *all* wire communications between conspirators. However, Agent Kutney and the other executing agents did not always act pursuant to their "understanding". In fact, some non-pertinent conversations between conspirators were minimized. For example, on October 17, 1981, a conversation between Peck and Newall, both identified conspirators, was minimized. "Motives" and "understandings" of executing officers are not determinative of the minimization issue, *Scott v. United States,* 436 U.S. at 135–38, 98 S.Ct. at 1722–23; the evidence indicates that some non-pertinent calls between conspirators were, in fact, minimized. We are, therefore, unable to conclude that the alleged egregious failure to minimize actually occurred.

Third, although statistics do not tell the whole story, *Scott v. United States,* 436 U.S. at 132, 98 S.Ct. at 1720, they are nevertheless supportive of our conclusion. Although 346 conversations were intercepted, defendants have only identified a small fraction thereof, approximately 10% which, they claim, should have been minimized. ▮ Based upon the foregoing factors we conclude that the testimony and evidence adduced at the suppression hearing, and the figures compiled by the government establish a *prima facie* case of compliance with the minimization aspects of the authorizing order. *United States v. Turner,* 528 F.2d at 157. *See, United States v. Vento,* 533 F.2d at 852 (minimization issues should be decided on a case-by-case basis). We also conclude that defendants have failed to articulate effective alternative procedures which would nevertheless permit the government to achieve its legitimate objectives. *United States v. Armocida,* 515 F.2d 29, 45 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Therefore, we will deny the motion.

Defendants Josephine and Louis DeMaise raise additional issues. They assert that as husband and wife their conversations are entitled to a greater degree of protection than that accorded to the conversations of other defendants. The DeMaises make two specific arguments in this regard. First, they assert that both state, 18 Pa.Con.Stat. Ann. § 5711, and federal law, 18 U.S.C. § 2517(4), prohibit the interception of privileged communications. Therefore, they contend that their communications *inter se* were impermissibly seized and cannot be used as evidence against them. Second, these defendants argue that *all* intercepted conversations which either of them had with third persons must be suppressed because the failure to do so will amount to a circumvention of the aforementioned privilege.

This second argument is based upon two recent cases, *In Re Grand Jury Matter,* 673 F.2d 688 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982) and *Appeal of Maltifano,* 633 F.2d 276 (3d Cir.1980), and the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). *See generally, United States v. Gibbs,* 703 F.2d 683, 687–690 (3d Cir. 1983).

The DeMaises argue that the salutary goal of fostering harmony in the marital relationship, *Trammel v. United States,* 445 U.S. 40, 44, 100 S.Ct. 906, 909, 63 L.Ed.2d 186 (1980); *Commonwealth v. Wilkes,* 414 Pa. 246, 251, 199 A.2d 411 (1964), can best find expression by suppressing *all* conversations in which they were participants. They reason that their alleged involvement in a criminal conspiracy does not destroy the privilege, *Appeal of Malfitano,* 633 F.2d at 279; and because evidentiary rules permit the use of one conspirator's statements against all other conspirators, *United States v. Trowery,* 542 F.2d 623, 626 (3d Cir.1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977), testifying spouses may assert the privilege when questioned about conspiratorial conduct in which third persons are involved so long as their spouse is also a co-conspirator.

Indeed, the law of this Circuit could not be clearer:

[W]hen ... the Government openly seeks one spouse's testimony concerning the activity of a third party, who is alleged to have engaged in a common criminal scheme with a husband and his wife, and the Government thereby hopes also to reach the non-witness spouse, the testimony sought is sufficiently adverse to the interests of the absent spouse to permit invocation of the privilege against spousal testimony.

Therefore,

a wife who asserts the privilege should not be compelled to testify ... when her spouse is a target of the same underlying investigation as the party against whom she is called to testify.

*In Re Grand Jury Matter,* 673 F.2d at 692–93.

We now turn to the issues raised by the DeMaises and consider the latter one first.

In pressing their argument, the DeMaises urge that the playing at trial of their tape-recorded conversations with third parties has the same practical and legal effect as being *forced to testify* in court against those same persons. Since the intercepted evidence will also be admitted against their spouses, they complain that they are being forced "in effect" to "testify" against their spouses. This, they say, is impermissible. Hence, we consider whether taped conversations between a spouse and a third person, when played to a jury, is analogous to forcing the declarant spouse to testify against the non-declarant spouse's cohorts. If it is, then the DeMaises must prevail. Courts have considered similar issues and provide some guidance.

*Hunter v. Hunter,* 169 Pa.Super. 498, 83 A.2d 401 (1951), held that confidential communications between husband and wife, secretly monitored and recorded by the husband's son from a prior marriage, could not be admitted over the wife's objection. In

so holding, the court opined that the admission of the tape would violate the privilege by enabling the husband to "utilize mechanical means of repeating [the wife's] words, thus accomplishing indirectly what he could not do directly".[12] *Id.* at 504, 83 A.2d 401. *Accord, United States v. Neal,* 532 F.Supp. 942, 948–49 (D.Colo.1982). Other courts disagree. *See, United States v. Engleman,* 648 F.2d 473, 480 (8th Cir.1981) (No error in introducing taped spousal communications where one spouse consents thereto); *United States v. King,* 536 F.Supp. 253, 267–68 n. 22 (D.C.Cal.1982).

■ A reading of *Hunter* which equates voluntary taped statements with compelled courtroom testimony is unnecessarily broad and unwarranted. To so hold would, by analogy, erect a bar to the introduction of all recorded statements made by criminal defendants. They would simply argue that the playing of their taped conversations to a jury amounts to compelled testimony in violation of their Fifth Amendment right against self-incrimination. However, it is beyond peradventure that absent compelled, coerced or involuntary remarks, the introduction of a defendant's own words does not violate the Fifth Amendment. *Lefkowitz v. Cunningham,* 431 U.S. 801, 804–06, 97 S.Ct. 2132, 2135–36, 53 L.Ed.2d 1 (1977); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). It is equally clear that the introduction of a defendant's taped remarks, played to a jury, does not offend the aegis of the Fifth Amendment. *United States v. Richman,* 600 F.2d 286, 295 (1st Cir.1979). We, therefore, conclude that the offer of voluntarily spoken taped remarks between either married defendant and third parties does not amount to spousal "testimony", offends no privilege and may be received into evidence at trial.

■ The government may not, however, introduce recordings of conversations di-

---

12. The *Hunter* court deemed the husband's secret taping of otherwise confidential conversations "reprehensible" because he "goaded [his wife] into making derogatory aspersions and deliberately prolonged the discussions when

she indicated that she wanted to go to sleep". 169 Pa.Super. at 501–2, 83 A.2d 401. The court also expressed concern that the recorder's operator could have excised the husband's unfavorable statements from the tape. *Id.*

rectly between the married couple. Whether viewed in the context of minimization, *United States v. Hyde,* 574 F.2d at 870, *United States v. DePalma,* 461 F.Supp. at 819, 821–22, or as a trial ruling, both relevant statutes provide that "*no* otherwise privileged communication ... shall lose its privileged character" by virtue of its interception. 18 Pa.Con.Stat.Ann. § 5711 and 18 U.S.C. § 2517(4) (emphasis added). Although the marital privilege does not extend to "ordinary daily exchanges between the spouses", *Commonwealth v. Darush,* 279 Pa.Super. 140, 420 A.2d 1071–1079 (1961), Pennsylvania nevertheless generally "infer[s]" that "communications made by one spouse to the other [are] made with the intent [that they be retained in] confidence" and are privileged. *Hunter v. Hunter,* 169 Pa. at 503, 83 A.2d 401 (quotation omitted). The government has not successfully overcome this "inference", particularly in light of the fact that this Circuit recognizes that conspiratorial utterings between spouses are privileged. *Appeal of Malfitano,* 633 F.2d at 279. Reading the cited privilege statutes in accordance with their "plain meaning" and recognizing that they fail to admit to any exception, we conclude that intercepted communications between the DeMaises are privileged and must be suppressed.

■■■ We now briefly consider defendants' complaint that the failure to serve them with timely inventories of intercepted communications requires suppression. *See,* 18 Pa.Con.Stat.Ann. § 5716 and 18 U.S.C. § 2518(8)(d). Defendants claim that the six-month delay in serving them with wiretap inventories has unfairly prejudiced them in that they are currently unable to reconstruct their conversations. Responding, the government asserts that the delay was properly granted for statutorily sanctioned "good cause" in that a federal grand jury was then investigating the parties.

Notwithstanding defendants' assertion that, at the relevant time, no grand jury investigation was being conducted, we accept the government's contrary representation and conclude that "good cause" was, in fact, shown and no statutory violation occurred. Disclosure of inventories during the pendency of a grand jury investigation is not mandated. *Application of the United States for An Order Authorizing The Interception of Oral Communications,* 545 F.Supp. 1271, 1273 (D.P.R.1982); *Application of The United States Authorizing The Interception of Wire Communications,* 413 F.Supp. 1321, 1326–27 (E.D.Pa.1976); *United States v. Lawson,* 334 F.Supp. 612, 616 (E.D.Pa.1971).

The final issue which defendants have raised need not detain us. They argue that the regular progress reports submitted to Judge Cavanaugh impermissibly stated in boilerplate language that continued covert surveillance was required. Further, they assert that the conclusory information submitted to the issuing judge impeded his ability to discharge the statutory obligation to determine the progress of the investigation and the need for its continuance. Defendants, essentially admitting that *United States v. Iannelli,* 477 F.2d 999, 1002 (3d Cir.1973), *aff'd,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), forecloses their argument, urge that "[d]espite" contrary appellate court authority, we should suppress the evidence.

Whatever the logic of defendants' position, federal courts are "hierarchical [in] nature", *United States v. Criden,* 681 F.2d 919, 922 (3d Cir.1982); we are bound by, and will follow, *Iannelli.*

An appropriate order shall issue denying all motions to suppress wiretapped conversations except conversations directly between defendants Josephine and Louis DeMaise. We shall also hold the remainder of the motions under advisement, pending further hearing and order of the Court.